UNITED STATES, Appellee

v

RICHARD F. STEWART, Private First Class,
U. S. Army, Appellant

7 USCMA 232, 22 CMR 22

No. 8285

Decided August 10, 1956

*First Lieutenant Norman W. Polovoy* argued the cause for Appellant, Accused.  With him on the brief was *Captain Frank C. Stetson.*

*First Lieutenant Lewis W. Evans* argued the cause for Appellee, United States.  With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant John E. Riecker.*

.HOMER FERGUSON, Judge:

The accused was tried and convicted by general court-martial of the wrongful possession of marihuana, a violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for one year. The findings and sentence were affirmed by intermediate appellate authorities, and we granted review to consider whether the instructions on reconsideration of a finding were correct.

The accused was returned to his barracks in a condition of stupefaction due to overindulgence in alcohol. A courtesy patrol, with the aid of Sergeant Quintana, the Acting Charge of Quarters, put the accused to bed. Sergeant Quintana testified that preparatory to removing the accused's clothing, he discovered a package containing one Japanese cigarette inserted between the accused's belt buckle and his body. The cigarette contained marihuana.

The accused took the stand and denied any knowledge of the cigarette or its contents. He had become inebriated during an evening of heavy drinking, and his last recollection was leaving a bar at about 7:30 p.m., and proceeding to an alley, where he became violently ill. Thereafter he faintly recalled being carried and deposited in a jeep. He categorically denied ever purchasing or using marihuana, and was completely mystified as to how the cigarette found its way into his possession.

The record discloses that after the court closed to deliberate and vote on the findings, the law officer was called into the closed session. As soon as he realized that no finding had been reached, he requested that the court be reopened. After reopening, the president questioned the law officer with respect to voting, in pertinent part as follows:

"PRES: But you can reconsider as many times as the court may determine?

"LO: You can reconsider as many times as—the president may ask the court to reconsider its vote, subject to objection of any member of the court. That does not preclude any member of the court from voicing an objection. A member may object, state his reason, and the court may reconsider.

"PRES: Is it a one-time vote?

"LO: That question has just been raised and answered. I have just indicated that a court may vote and reconsider its vote prior to announcing its findings. It may still reconsider its vote, even after objection, in closed session, but that will require a determination by the president and the court. However, the court will take another brief recess to check that point or any other point the court desires cleared up at this time on voting procedures."

In order to arrive at an intelligent determination as to the meaning intended to be conveyed by a statement or conversation, an objective consideration must be made of the entire context of the language employed. Here the tenor of the conversation between the law officer and the president left but one logical conclusion, which was to the effect that reconsideration of the findings was within the discretion of the president, subject to objection by any member of the court. Stated differently, the understanding conveyed by the law officer's instruction singled out the president as having the sole power to request a reconsideration of the finding, and, conversely, denied to the remaining members of the court any such right.

We were confronted with a similar factual situation in United States v Nash, 5 USCMA 550, 18 CMR 174, which case we feel is controlling in this instance. We there stated:

"We hold differently, however, with regard to his answer that it is discretionary with the president of the court-martial whether there should be more than one ballot. Here again

the Code does not specifically answer the question. However, we have no doubt that it inferentially sets out the correct procedure to be followed. After establishing in subparagraphs (*a*) and (*b*) the voting requirements for conviction and sentencing, Article 52 of the Code, 50 USC § 627, provides in subparagraph (*c*) that all other questions to be decided by the members of a general or special court-martial shall be determined by a majority vote. When this Article is interpreted together with the provisions of the Manual to the effect that the court may reconsider any finding before it is announced in open court, it follows that this is the question to be decided by the members. Counsel for the Government advance no argument to the contrary and we find no basis for any.

. . . . .

"We have no doubt that the provisions of the Code and the Manual on this point of procedure were intended to prevent the senior member of the court-martial from exercising any undue influence on the findings or sentence of the court. To allow him to be the sole judge as to the number of ballots to be taken would run counter to that policy. It is true that he is given some powers and responsibilities over and above those of the other court-martial members, but they are principally duties placed on a presiding officer. For example, in regard to voting and findings, he decides the order in which offenses shall be voted on, where more than one is to be considered; if additional instruction is needed, he requests that the court be opened and he speaks for the court-martial members; and he announces the vote and sentence. In those matters he is the military counterpart of the civilian foreman of the jury. But in all matters where a ballot may fix the guilt or innocence of an accused, his vote is equal to, but no greater than, that of the other members (paragraph 41*b* of the Manual). In those instances, his position, rank, or authority cannot be employed in any manner which will directly or indirectly influence the voting of his fellow court-martial members."

The Government advances the argument that there is a difference between the instructions given by the law officer in Nash, supra, and those given in the instant case, because there the law officer more emphatically singled out the president as being the individual responsible for any additional voting, while here the law officer spoke of the president and the court members on equal terms. We feel that any difference between the two cases is at best only one of degree. In Nash, supra, the law officer stated, "it is within the prerogative of the president of the court whether he wants further discussion, reballoting, or further reballoting. That's within his prerogative and discretion." In this case, the law officer, when correctly asked by the president whether reconsideration could be had "as many times as the *court* may determine?" (emphasis supplied), incorrectly prefaced his answer with the statement that "the president may ask the court to reconsider its vote, subject to objection of any member of the court." Those words were plain, unambiguous and prejudicial, and the taint was not removed by the subsequent statement of the law officer that a *court* may reconsider its vote "but that will require a determination by the president and the court." Most assuredly the court will vote during any reconsideration but the president may not alone make the initial determination as to whether or not a revote will be solicited. That decision is not subject to the unilateral determination of the president, but may be advanced by any member of the court. Taken as a whole the law officer's instructions here unduly elevated the status of the president over the remaining members of the court.

The Government also argues that trial defense counsel's failure to question the correctness of the law officer's instruction constituted a waiver. The same argument was advanced in Nash, supra. It received there no more consideration than it will here receive. We feel that there was a reasonable

probability that the error in the instant case may have affected the court's verdict. The accused has no mechanical apparatus, capable of extrasensory perception, with which he can accurately guage the contents of the court's collective mind. If there is a reasonable probability that prejudice resulted, the findings must be set aside. Little v United States, 73 F2d 861 (CA 10th Cir) (1934).

The evidence in this case was far from compelling. The testimony of the various witnesses was decidedly in conflict and the court members indicated by their questions, and the recall of two witnesses, that there lingered in their minds more than a little doubt with respect to just where the truth did reside.

In view of the foregoing, the decision of the board of review is reversed and a rehearing is ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result) :

I concur in the result.

I would concur outright if it were not for the manner in which the author Judge disposes of the question of waiver. This case involves no more than the law officer giving confusing instructions on voting procedure, and times without number we have held that if clarification of instructions is desired, it is incumbent upon defense counsel to request that the court be instructed clearly. In those instances where we have refused to reverse because of failure on the part of defense counsel to act, we were not concerned with whether the accused could measure the effect of confusion. We simply concluded that he had forfeited his right to complain on appeal. As I understand the doctrine of waiver, it is founded on a concept that error has been committed, but failure on the part of defense counsel to call it to the attention of the court-martial when it could be corrected prevents it from being considered on appeal. That rule, however, is generally not invoked where a miscarriage of justice could result from its enforcement. In this particular instance, the question of guilt was decidedly in issue and the members of the court-martial could reasonably have found for the Government or for the defendant, depending upon which witnesses were believed. The record shows the court was concerned over the number of votes required for conviction or acquittal, this indicates there must have been some dispute concerning the proper verdict, and the confused instruction could be interpreted to leave the question of subsequent ballots as one to be decided by the president. The evidence is far from compelling, and, because of the possibility that a miscarriage of justice might result from its use, I would not invoke the doctrine of waiver.